**ORAL ARGUMENT NOT YET SCHEDULED**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 22-1271 (and consolidated cases)

---

UNITED STATES SUGAR CORPORATION,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

---

PETITION FOR REVIEW OF FINAL ADMINISTRATIVE ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

---

**PROOF OPENING BRIEF OF CALIFORNIA COMMUNITIES AGAINST
TOXICS, COALITION FOR A SAFE ENVIRONMENT, SIERRA CLUB,
AND UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT**

James S. Pew
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for California Communities
Against Toxics, Coalition For A Safe
Environment, Sierra Club, and Utah
Physicians for a Healthy Environment*

**DATED: June 26, 2023**

<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| U.S. SUGAR CORP.,<br><br>      *Petitioner*,<br><br>      v.<br><br>U.S. ENVIRONMENTAL<br>PROTECTION AGENCY,<br><br>      *Respondent*. | Case No. 22-1271 (and consolidated cases) |

**ENVIRONMENTAL PETITIONERS' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 27(a)(4), California Communities Against Toxics, Coalition For A Safe Environment, Sierra Club, and Utah Physicians for a Healthy Environment (collectively "Environmental Petitioners") submit this Certificate as to Parties, Rulings, and Related Cases.

**(A)  Parties and *Amici***

  **(i)  Parties, Intervenors, and *Amici* Who Appeared in the District Court**

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

  **(ii) Parties to This Case**

Petitioners:

| 22-1271 | U.S. Sugar Corporation |
|---------|----------------------|
| 22-1302 | American Forest and Paper Association, American Wood Council, and Council of Industrial Boiler Owners |
| 22-1303 | California Communities Against Toxics, Coalition For A Safe Environment, Sierra Club, and Utah Physicians for a Healthy Environment |

Respondents:

Respondents in the above-captioned case are the United States

Environmental Protection Agency ("EPA") and Michael S. Regan, in his official

capacity as Administrator of the EPA.

Intervenors:

Sierra Club has been granted leave to intervene in support of respondent in

No. 22-1271. American Forest and Paper Association, American Chemistry

Council, American Iron and Steel Institute, American Wood Council, Coalition for

Responsible Waste Incineration, and Council of Industrial Boiler Owners have

been granted leave to intervene in support of respondents in No. 22-1303.

**(iii) *Amici* in This Case**

None at present.

**(iv) Circuit Rule 26.1 Disclosures**

See disclosure statement filed herewith.

**(B) Rulings Under Review**

Petitioners seeks review of the final action taken by EPA in the final rule entitled "National Emission Standards for Hazardous Air Pollutants: Industrial, Commercial, and Institutional Boilers and Process Heaters" and published at 87 Fed. Reg. 60,816 (October 6, 2022).

**(C) Related Cases**

None at present.

DATED:    June 26, 2023                    Respectfully submitted,

                                           /s/ *James S. Pew*
                                           James S. Pew
                                           Earthjustice
                                           1001 G Street, NW, Suite 1000
                                           Washington, DC 20001
                                           (202) 667-4500
                                           jpew@earthjustice.org

                                           *Counsel for California Communities*
                                           *Against Toxics, Coalition For A Safe*
                                           *Environment, Sierra Club, and Utah*
                                           *Physicians for a Healthy Environment*

## ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| U.S. SUGAR CORP., | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | Case No. 22-1271 (and consolidated cases) |
| | ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| | ) | |
| *Respondent*. | ) | |
| | ) | |

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 28(a)(1) and

D.C. Circuit Rule 26.1, California Communities Against Toxics, Coalition For A

Safe Environment, Sierra Club, and Utah Physicians for a Healthy Environment

(collectively, "Environmental Petitioners") make the following disclosures:

### California Communities Against Toxics

<u>Non-Governmental Corporate Party to this Action</u>: California Communities

Against Toxics ("CCAT").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

Party's General Nature and Purpose: California Communities Against Toxics is a non-profit organization that is a project of a non-profit corporation (Del Amo Action Committee) that is organized and existing under the laws of the State of California.  It is an environmental justice network that aims to reduce exposure to pollution, to expand knowledge about the effects of toxic chemicals on human health and the environment, and to protect the most vulnerable people from harm.

## Coalition For A Safe Environment

Non-Governmental Corporate Party to this Action: Coalition For A Safe Environment ("CFASE").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: CFASE is a not-for-profit organization based in Wilmington, California dedicated to improving the environment, public health, public safety, and socio-economic justice through advocacy, community organizing, research, and public education.

## Sierra Club

Non-Governmental Corporate Party to this Action: Sierra Club.

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

### Utah Physicians for a Healthy Environment

Non-Governmental Corporate Party to this Action: Utah Physicians for a Healthy Environment ("UPHE").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: Utah Physicians for a Healthy Environment is a not-for-profit civic organization of health care professionals, including physicians, biologists, toxicologists, engineers, air quality specialists and members of the public concerned about pollution. Utah Physicians for a Healthy Environment is dedicated to protecting the health and well-being of the citizens of Utah by promoting science-based education and interventions that result in progressive, measurable improvements to the environment.

DATED:    June 26, 2023                    Respectfully submitted,

/s/ *James S. Pew*
James S. Pew
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for California Communities Against Toxics, Coalition For A Safe Environment, Sierra Club, and Utah Physicians for a Healthy Environment*

## <u>TABLE OF CONTENTS</u>

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................................. vi

JURISDICTIONAL STATEMENT ..................................................................1

STATUTES AND REGULATIONS ................................................................1

STATEMENT OF ISSUES ............................................................................1

STATEMENT OF THE CASE ........................................................................2

    I.     INTRODUCTION ................................................................... 2

    II.    FACTUAL BACKGROUND.................................................... 3

    III.   STATUTORY BACKGROUND ............................................. 6

    IV.   PRIOR LITIGATION AND REGULATORY BACKGROUND ........ 8

        A.  Prior Rulemaking and Litigation ..................................... 8

        B.  The Challenged Rule ..................................................... 11

SUMMARY OF ARGUMENT ....................................................................15

STANDARD OF REVIEW ..........................................................................18

STANDING ...............................................................................................19

ARGUMENT ..............................................................................................20

    I.     EPA'S NEW EMISSION LIMITS CONTRAVENE § 112(d)(3)'S FLOOR REQUIREMENTS ..................................................... 20

    II.    U.S. SUGAR DOES NOT EXCUSE EPA FROM COMPLIANCE WITH THE CLEAN AIR ACT ........................................... 21

    III.   EPA'S STATUTORY INTERPRETATION IS UNLAWFUL ......... 24

        A.  EPA's Statutory Interpretation Is Contrary to Congress's Plainly Expressed Intent ....................................................... 24

        B.  EPA's Statutory Interpretation Is Unlawful under *Chevron* Step Two .......................................................................... 29

    IV.   EPA'S FLOOR APPROACH IS ARBITRARY AND CAPRICIOUS.................................................................... 32

CONCLUSION .......................................................................................... 35

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT................. 36

CERTIFICATE OF SERVICE ..................................................................... 37

# <u>TABLE OF AUTHORITIES</u>

## CASES                                                                  PAGE(s)

*American Mun. Power v. EPA*,
  137 S. Ct. 2296 (2017) ............................................................. 2,7

*Ass'n of Battery Recyclers v. EPA*,
  716 F.3d 667 (D.C. Cir. 2013)................................................20

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002) ................................................................25

\* *Cement Kiln Recycling Coalition v. EPA*,
  255 F.3d 855 (D.C. Cir. 2001)......................... 8, 9, 15, 17, 19, 21, 31, 32, 33, 34

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council*,
  467 U.S. 837 (1984) ............................................. 18, 26, 29

*Cnty. of Los Angeles v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999)...........................................34

*Friends of the Earth v. Laidlaw Env't Servs. (TOC)*,
  528 U.S. 167 (2000) ................................................................19

*Lamie v. U.S. Trustee*,
  540 U.S. 526 (2004) ................................................................18

*Massachusetts v. U.S. Dep't of Transp.*,
  93 F.3d 890 (D.C. Cir. 1996).......................................... 18, 29

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015) ...................................... 18, 29, 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................19

\* *Authorites chiefly relied upon marked with asterisks*

*Nat'l Ass'n of Clean Water Agencies v. EPA,*
     734 F.3d 1115 (D.C. Cir. 2013)...................................................... 21, 34

*New Jersey v. EPA,*
     517 F.3d 574 (D.C. Cir. 2008)...................................... 7, 26, 27, 29, 31

*NRDC v. EPA,*
     489 F.3d 1250 (D.C. Cir. 2007)............................................... 8, 23, 26

*NRDC v. EPA,*
     749 F.3d 1055 (D.C. Cir. 2014)......................................................20

*Shays v. FEC,*
     528 F.3d 914 (D.C. Cir. 2008).........................................................18

*Sierra Club v. EPA,*
     21 F.4th 815 (D.C. Cir. 2021).........................................................27

*Sierra Club v. EPA,*
     699 F.3d 530 (D.C. Cir. 2012).........................................................20

* *Sierra Club v. EPA,*
     479 F.3d 875 (D.C. Cir. 2007) ...............2, 7, 8, 10, 15, 16, 19, 20, 21, 23, 27, 31-34

*S. Coast Air Quality Mgmt. Dist. v, EPA,*
     472 F.3d 882 (D.C. Cir. 2006).........................................................31

*Transactive Corp. v. U.S.,*
     91 F.3d 232 (1996) .........................................................................34

* *U.S. Sugar Corp. v. EPA,*
     830 F.3d 579 (D.C. Cir. 2016)...................... 2, 7, 9, 12, 15, 16, 21, 28, 31, 33, 34

*U.S. Sugar v. EPA,*
     671 Fed. Appx. 822 (D.C. Cir. 2016) ........................................ 10, 21

*United States Sugar Corp. v. EPA,*
     D.C. Cir. No. 11-1108, (filed September 12, 2016)............................10

*Util. Air Regul. Group v. EPA*,
　573 U.S. 302 (2014) ....................................................... 18, 22, 28, 30

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*,
　636 F.3d 650 (D.C. Cir. 2011) ................................................ 19, 30

*Whitman v. American Trucking Ass'ns.*,
　531 U.S. 457 (2001) ........................................................... 27, 31

**STATUTES**

42 U.S.C. § 7412 .......................................................................1

42 U.S.C. § 7412(b) ...................................................................7

42 U.S.C. § 7412(c)(1) ...............................................................7

42 U.S.C. § 7412(c)(2) ...............................................................7

42 U.S.C. § 7412(c)(6) ...............................................................5

* 42 U.S.C. § 7412(d)................................ 1, 7, 15, 17, 19, 23, 24, 27, 28, 32

42 U.S.C. § 7412(d)(2) ............................................. 7, 16, 22, 23, 24, 28

* 42 U.S.C. § 7412(d)(3) ............. 1, 2, 7, 15, 16, 17, 20, 26, 27, 28, 29, 30, 31, 32 33

42 U.S.C. § 7412(d)(3)(A) .................................... 8, 24, 25, 26, 27, 29, 30

42 U.S.C. § 7412(d)(3)(B) ............................................... 8, 25, 30

42 U.S.C. § 7412(d)(4)............................................... 16, 22, 23, 24

42 U.S.C. § 7412(d)(5) ............................................... 16, 22, 23,24

42 U.S.C. § 7412(e)(1)................................................................29

42 U.S.C. § 7412(e)(1)(E).............................................................8

42 U.S.C. § 7607(b)(1)................................................................1

iv

**FEDERAL REGISTER NOTICES**

61 Fed. Reg. 17,358 (April 19, 1996) .......................................................6

69 Fed. Reg. 55,218 (Sept. 13, 2004) .......................................................8

70 Fed. Reg. 76,918 (Dec. 28, 2005) .......................................................8

75 Fed. Reg. 32,006 (June 4, 2010) .......................................................4

76 Fed. Reg. 15,608 (March 21, 2011) .................................................5, 9

78 Fed. Reg. 7,138 (January 31, 2013) .............................................. 9, 12

* 87 Fed. Reg. 60,816 (October 6, 2022) ..............................1, 3, 4, 6, 7, 11-17, 21-33

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to DC Circuit Rule 28(a)(3), the following is a glossary of

acronyms and abbreviations used in this brief:

| | |
|---|---|
| Environmental Petitioners | California Communities Against Toxics, Coalition For A Safe Environment, Sierra Club, and Utah Physicians for a Healthy Environment |
| EPA | Respondents U.S. Environmental Protection Agency and Administrator Michael S. Regan |
| JA | Joint Appendix |
| App. | Appendix |

## JURISDICTIONAL STATEMENT

**Agency.** Respondents U.S. Environmental Protection Agency, *et al.* (hereinafter collectively "EPA" or "the agency") have jurisdiction to promulgate emission standards under § 112 of the Clean Air Act, 42 U.S.C. § 7412, for Industrial, Commercial, and Institutional Boilers and Process Heaters operating at major sources of hazardous air pollutants ("Industrial Boilers").

**Court of Appeals.** Pursuant to Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1), this court has jurisdiction to review the final action taken by EPA at 87 Fed. Reg. 60,816 *et seq.* (October 6, 2022), JA____-___, and titled "National Emission Standards for Hazardous Air Pollutants for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters."

**Timeliness.** This petition for review was timely filed within the 60-day period provided by Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1), on December 5, 2022.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in an addendum to this brief.

## STATEMENT OF ISSUES

1. Whether EPA violated the Clean Air Act by issuing § 112(d) emission limits that do not satisfy the stringency requirements in § 112(d)(3), 42

U.S.C. § 7412(d)(3).

2. Whether EPA violated Clean Air Act § 112(d)(3) by establishing statutory minimum stringencies (floors) for its emission limits that do not reflect the average emission levels actually achieved by the relevant best performing Industrial Boilers.

3. Whether EPA acted arbitrarily and capriciously by failing to demonstrate with substantial evidence that the emission limits it promulgated reflect the actual emission levels achieved by the relevant best performing Industrial Boilers.

## STATEMENT OF THE CASE

### I.    INTRODUCTION.

The challenged rule is EPA's response to this Court's remand of the emission standards for Industrial Boilers that EPA promulgated in 2013. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 630-632 (D.C. Cir. 2016), *cert. denied sub nom. American Mun. Power v. EPA*, 137 S. Ct. 2296 (2017). As *U.S. Sugar* explains, those standards were unlawful because EPA excluded some of the best performing sources from its floor calculations in a maneuver that was "no different" than one the Court had already rejected. *Id.* at 632 (citing *Sierra Club v. EPA*, 479 F.3d 875 (D.C. Cir. 2007)).

2

EPA has done the same thing again. This time EPA "has chosen" to exclude all the emissions information it has collected for Industrial Boilers over the last decade from its floor calculations. 87 Fed. Reg. at 60,822/1, JA____. Although the Clean Air Act requires EPA's floors to reflect the emission levels actually achieved by the best performers, EPA admits its approach produced floors that – for 22 out of the 34 remanded limits – are worse than the level every boiler has been required to achieve for many years.

Explaining its floor approach, EPA candidly discloses it did not want to set floors reflecting the emission levels actually achieved by the best performing boilers because they could be "more stringent." *Id.* at 60,822/1, JA____. As shown below, EPA's choice to elevate its policy preference for less stringent standards over the text of the Clean Air Act and this Court's precedent is unlawful and arbitrary.

## II.    FACTUAL BACKGROUND.

The approximately 14,000 Industrial Boilers operating in America remain one of the nation's largest and worst sources of hazardous air pollution. Of these, by far the worst polluters are the approximately 2,000 units burning liquid and solid fuels that range from used oil to coal, hog fuel, bagasse and other agricultural waste, tires, industrial and municipal sludge, plastics, paper, and paper mill residues. *See* EPA-HQ-OAR-2002-0058-3836, Revised MACT Floor Analysis for

3

the Industrial, Commercial, and Institutional Boilers and Process Heaters National Emission Standards for Hazardous Air Pollutants ("2012 Floor Memo"), apps. A-1a(ii), A-1b(ii), JA____ (showing different fuels burned in Industrial Boilers). EPA-HQ-OAR-2002-0058-3383, Revised Methodology for Estimating Cost and Emissions Impacts for Industrial, Commercial Institutional Boilers and Process Heaters National Emission Standards for Hazardous Air Pollutants ("Cost and Emissions Impacts Memo") at app. B-5, JA____ (baseline emissions from existing boilers burning different types of fuel), app. B-6, JA____ (baseline emissions from new boilers different types of fuel). These liquid and solid fuel boilers account for the vast majority of Industrial Boilers' aggregate toxic emissions. *Id.*

Collectively, Industrial Boilers continue to emit almost 6 tons of mercury and more than 4,000 tons of other toxic metals (including arsenic, cadmium, chromium, and lead) every year. Cost and Emissions Impacts Memo at app. B-5, JA____ (showing baseline emissions and 2013 Rule's estimated reductions from existing boilers), app. B-6, JA____ (baseline emissions and estimated reductions from new boilers); 87 Fed. Reg. at 60,834 (Table 6, emission reductions from 2022 Rule). They also emit organic hazardous air pollutants, including dioxins and furans ("dioxins"), polychlorinated biphenyls (PCBs), polycyclic organic matter ("POM"), formaldehyde, acetaldehyde, and benzene. 75 Fed. Reg. 32,006, 32,011/2-3 (June 4, 2010), JA____; EPA-HQ-OAR-2002-0058-4084, Report of

4

Air Pollution Source Testing Unit 1 Biomass Fuel Fired Steam Generating Plant("Delano Energy Test Report") at 5, JA____ (showing PCBs emissions).

Many of the hazardous air pollutants that Industrial Boilers emit cause cancer, birth defects, developmental damage, and other serious adverse health effects. EPA states the health effects associated with exposure to these pollutants may include "irritation of the lung, skin, and mucus membranes, effects on the central nervous system, damage to the kidneys, and alimentary effects such as nausea and vomiting." 76 Fed. Reg. 15608, 15611 (March 21, 2011), JA____. EPA has classified arsenic and chromium VI as known human carcinogens, and has classified cadmium, lead, dioxins/furans, and nickel as probable human carcinogens. *Id.*[1]

Some of the hazardous air pollutants that Industrial Boilers emit can impact people's health through multiple pathways: they persist in the environment, contaminating water and soil as well as air, and bioaccumulate in fish, wildlife, food sources, and people. As EPA has noted, Congress singled out mercury, dioxins, PCBs, and POM in Clean Air Act § 112(c)(6) "as being of 'specific concern' not just because of their toxicity but because of their propensity to cause

---

[1] EPA has also classified PCBs as a probable human carcinogen. https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls#:~:text=EPA's%20peer%20reviewed%20cancer%20reassessment,be%20probably%20carcinogenic%20to%20humans.

substantial harm to human health and the environment via indirect exposure

pathways (i.e., from the air through other media, such as water, soil, food uptake,

etc.)." 61 Fed. Reg. 17,358, 17,366/1 (April 19, 1996) (quoting S. Rep. No. 228,

101st Cong. 1st Sess. at 155, 166), JA____.  EPA has found, for example, that

mercury "is one of the more toxic metals known due to its bioaccumulation

potential and the adverse neurological health effects at low concentrations

especially to the most sensitive populations at risk (i.e., unborn children, infants

and young children)." *Id.* at 17,384/3, JA____.

EPA's record shows that its air toxics rules for Industrial Boilers have had

especially little effect on some of the most toxic pollutants that Industrial Boilers

emit. For example, EPA indicates that its 2013 Rule reduced Industrial Boilers'

emissions of mercury by less than ten percent, from approximately 6.2 tons per

year to approximately 5.7 tons per year. Cost and Emissions Impacts Memo at app.

B-5, JA____, app. B-6, JA____. It reduced emissions of dioxins not at all. *Id.*

EPA's 2022 Rule reduces mercury emissions by another 0.038 tons per year, less

than 1 percent, and – like the 2013 Rule – does not reduce dioxin emissions at all.

87 Fed. Reg. at 60,834 (Table 6), JA____.

## III.    STATUTORY BACKGROUND.

Frustrated by EPA's 18-year failure to control hazardous air pollution,

Congress rewrote Clean Air Act § 112 in the Amendments of 1990, "eliminating

6

much of EPA's discretion in the process." *New Jersey v. EPA*, 517 F.3d 574, 578

(D.C. Cir. 2008). Rather than relying on EPA to identify which pollutants are

hazardous and determine the appropriate level of control, Congress listed 187

pollutants as hazardous in § 112(b). 42 U.S.C. § 7412(b). *See U.S. Sugar Corp. v.*

*EPA*, 830 F.3d 579, 592-593 (D.C. Cir. 2016), *cert. denied sub nom. American*

*Mun. Power v. EPA*, 137 S. Ct. 2296 (2017). Congress then directed EPA to list all

the categories of major sources of the pollutants and set national emission

standards for each of these categories "under subsection (d) of this section." *Id.*

§ 7412(c)(1)-(2). *See U.S. Sugar*, 830 F.3d at 593.

Subsection 112(d) provides that "[e]mission standards promulgated under

this subsection and applicable to new or existing sources of hazardous air

pollutants shall require" the "maximum" degree of reduction that is "achievable"

considering cost and other enumerated factors. 42 U.S.C. § 7412(d)(2). It then

establishes statutory minimum stringencies for air toxics standards, commonly

referred to as "floors" or "MACT floors." 42 U.S.C. § 7412(d)(3). *See* 87 Fed.

Reg. at 60,820, JA____. For existing sources in categories or subcategories with 30

or more sources, the degree of emission reduction EPA deems "achievable" under

§ 112(d)(2) "shall not be less stringent than [] the average emission limitation

achieved by the best performing 12 percent of the existing sources (for which the

Administrator has emissions information)…" *Sierra Club*, 479 F.3d at 877

7

(quoting 42 U.S.C. § 7412(d)(3)(A)). For categories or subcategories with fewer than 30 sources, what EPA deems achievable "shall not be less stringent than the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information)." 42 U.S.C. § 7412(d)(3)(B). As this Court has made clear, floors must reflect "the average emission level actually *achieved* by the best performers (those with the lowest emission levels.)" *Sierra Club*, 479 F.3d at 880-881 (citing *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 861 (D.C. Cir. 2001)).

## IV.  PRIOR LITIGATION AND REGULATORY BACKGROUND.

### A. Prior Rulemaking and Litigation.

Although the Clean Air Act required EPA to issue air toxics standards for Industrial Boilers no later than November 15, 2000, 42 U.S.C. § 7412(e)(1)(E), the agency failed to do so until 2004. 69 Fed. Reg. 55,218 (Sept. 13, 2004), as amended on reconsideration, 70 Fed. Reg. 76,918 (Dec. 28, 2005) ("2005 Rule"). This Court vacated those standards as unlawful, finding EPA had incorrectly defined many industrial incinerators as Industrial Boilers and included these incinerators in its floor calculations for the Industrial Boilers category. *NRDC v. EPA*, 489 F.3d 1250, 1253-1254 (D.C. Cir. 2007). The Court held that, as a result, EPA would have to recalculate the floors for both categories. *Id.* at 1254, 1262.

8

EPA did not promulgate replacement standards until 2011, leaving the public without any protection from Industrial Boilers' toxic pollution for another four years. 76 Fed. Reg. 15,608 (March 21, 2011), as amended on reconsideration, 78 Fed. Reg. 7,138 (January 31, 2013) ("2013 Rule"), JA____-____. Then, when it finally did promulgate the replacement standards, EPA made them weaker than the Clean Air Act allowed by excluding many of the best performing sources from its floor calculations in the 2013. *See U.S. Sugar*, 830 F.3d at 631-632.

Specifically, having divided both new and existing Industrial Boilers into subcategories based largely on the range of materials they burn as fuel, EPA excluded units burning cleaner fuels from its floor calculations for these subcategories. *Id.*

> Although the EPA allowed sources that combust only *10 per cent* of a subcategory defining fuel to join that subcategory, it declined to consider emissions from any source that burned *less than 90 per cent* of the subcategory-defining fuel when determining the average emissions level of the best performing sources in setting MACT floors for existing sources. And when it set a subcategory's MACT floors for new sources, the Agency declined to consider the emissions levels from any source that did not burn *100 per cent* of the fuel. This disparate treatment makes a difference; several sources excluded from the MACT-floor determination were among the best performing sources (or, in some cases, the single best performing source) in that fuel-based subcategory.

*Id.* (emphasis added). This Court vacated all the limits affected by that floor approach, finding it "no different" than the unlawful floor approach it had rejected

in *Sierra Club*, where EPA had also excluded the best performing sources from its floor calculations. *Id.* at 632. *See Sierra Club*, 479 F.3d at 880-881.

EPA did not contest the *U.S. Sugar* merits decision but, with the support of the Environmental Petitioners in that case, petitioned the Court for rehearing on remedy. United States Sugar Corp. v. EPA, D.C. Cir. No. 11-1108, (filed September 12, 2016), EPA's Petition for Panel Rehearing as to Remedy, Doc. #1635275 ("EPA Rehearing Petition"). EPA explained that the Environmental Petitioners in *U.S. Sugar* had requested remand without vacatur and that vacating the defective standards would deprive the public of any protection from boilers' toxic emissions until new ones could be promulgated. EPA Rehearing Petition at 1-2. *See* Environmental Petitioners' Response to EPA's Petition for Panel Rehearing as to Remedy (filed November 16, 2016), Doc. #1646507. EPA understood the Court had found the defects in its standards serious enough to require vacatur and that, even if the Court granted rehearing as to remedy, EPA would have to "recalculate and repromulgate" these standards. EPA Rehearing Petition at 11. *See also id.* at 6 ("promulgate revised standards"). The Court granted EPA's petition and remanded the 2013 Rule with instructions to "conduct further proceedings consistent with the court's prior opinion…" *U.S. Sugar v. EPA*, 671 Fed. Appx. 822, 823 (D.C. Cir. 2016).

10

**B. The Challenged Rule.**

The rule challenged in this litigation is EPA's response to the remand in *U.S. Sugar.* It establishes 34 new limits, which comprise slightly more than half of the 66 limits in the 2013 Rule. *Compare* 87 Fed. Reg. 60,817/1, JA____ ("The EPA is finalizing revisions to 34 different emission limits") *with* EPA Rehearing Petition at 7 (rule has a total of 66 limits).

At issue in the present case is EPA's decision to exclude from its floor calculations all the emissions data it has obtained since 2013, ensuring that its floors do not reflect the average emission levels actually achieved by the best performing boilers for which it has emissions information. EPA states that, because the 2013 Rule "incorporated electronic reporting requirements," it now has "numerous emission test reports and compliance data" that "are now available through the Compliance and Emissions Data Reporting Interface (CEDRI) and WebFIRE." 87 Fed. Reg. at 60,820/3, JA____. Nonetheless, EPA states it "has chosen to maintain the original data set for purposes of calculating standards." *Id.* at 60,822/1, JA____. The "original data set" includes only data EPA collected before 2013. *Id.*

EPA used a 99th percentile "upper prediction limit" ("UPL") to calculate floors from the pre-2013 emissions data. *Id.* at 60,820/2-3, JA____. As this Court has found, this UPL considers both the actual emissions data for the relevant

sources and the variation within these data to produce a floor that the relevant sources' emissions are predicted to fall below in 99 out of 100 tests. *U.S. Sugar*, 830 F.3d at 634-635. Thus, calculating floors based on emissions test results that are lower or less varied will result in lower (more protective) limits under EPA's floor approach, and calculating floors based on emissions test results that are higher or more varied will result in higher (less protective) limits.

Since January 31, 2016, every industrial boiler has had to comply with the emission limits in the 2013 Rule. 78 Fed. Reg. 7138, 7138/3 (January 31, 2013), JA____. Accordingly, the emission levels achieved by the existing population of boilers are both lower and less varied than the emission levels in EPA's pre-2013 dataset. Nonetheless EPA states that for 22 of the 34 limits it revised, its floor approach yielded floors that were worse than those limits allow. 87 Fed. Reg. at 60,826/1, JA____. Thus, although the statute requires floors to reflect the average emission levels achieved by the <u>best performing 12 percent of boilers</u> for which EPA has emissions information (or the <u>best performing 5 boilers</u> for which EPA has or could reasonably obtain emissions information in subcategories with fewer than 30 boilers), EPA admits it set floors that reflect higher emission levels – *i.e.* worse performance – than the levels the 2013 Rule has long required <u>every boiler</u> to achieve.

12

Explaining its decision to exclude the post-2013 emissions data from its floor calculations, EPA states the Court's decision in *U.S. Sugar* "did not address the question of whether the EPA should—let alone must—consider data that did not exist at the time the challenged rule was issued." *Id.* at 60,821/3, JA____. The agency also states *U.S. Sugar* remanded only some of the limits rather than vacating all of them. *Id.* Finally, EPA admits it did not want to include the post-2013 data in its floor calculations because doing so could result in "more stringent standards." *Id.* at 60,822/1, JA____.

In 2020, EPA recognized that its floor approach yielded "some" limits that are weaker than those in its 2013 Rule – *i.e.*, the limits every boiler has been achieving since 2016. EPA-HQ-OAR-2002-0058-3948, EPA, Revised MACT Floor Analysis (2019) for the Industrial, Commercial, and Institutional Boilers and Process Heaters National Emission Standards for Hazardous Air Pollutants – Major Source ("Revised Floor Analysis"), at 6-7, JA____-____. For these limits, EPA used the very same data it had refused to consider in its floor analysis to evaluate setting "beyond-the-floor" limits at the same level as the 2013 limits that were remanded in *U.S. Sugar*. EPA stated the purpose of this analysis was to determine whether those 2013 limits were "achievable." *Id.* at 6, JA____; 87 Fed. Reg. at 60,826/1, JA____.

13

EPA's beyond-the-floor analysis confirms virtually every boiler in the existing population is achieving emission levels at or below the 2013 limits. Revised Floor Analysis at 6-7, JA____-____. For example, EPA found that "all of the existing units with data available" are already achieving emission levels "below" the 2013 limit for hydrogen chloride (HCl) emissions from liquid fuel boilers. *Id.* at 6 (Table 1). *See also*, *e.g.*, Revised Floor Analysis, App. H at Tab 1, JA____ (showing every test result to be "less" than the 2013 HCl limit).

In many instances, the post-2013 data show the emission levels actually achieved by the relevant best sources are far better than EPA's floors or the limits in the 2013 Rule. For example, EPA's 2013 HCl limit for liquid fuel boilers is 0.0011 pounds per million British thermal units of heat input (1.1E-03 lb/MMBtu of heat input). 78 Fed. Reg. at 7197, JA____. EPA's post-2013 data show that more than half of the boilers for which EPA has post-2013 emissions information are achieving levels below 0.0001 lb/MMBtu – *i.e.*, are emitting at levels <u>less than one tenth</u> of that limit. Revised Floor Analysis, App. H, at Tab 1, JA____.

Based on its conclusion that the post-2013 data show boilers are achieving emission levels below the levels required by its 2013 Rule, EPA set beyond-the-floor limits equal to the 2013 limits in 16 of the 22 instances where its approach yielded floors that were less stringent than those limits. 87 Fed. Reg. at 60,826/1,

14

JA____. EPA weakened the other six limits, claiming it lacked data showing that its 2013 limits were achievable. *Id.*

## SUMMARY OF ARGUMENT

As Clean Air Act § 112(d)(3) makes plain, floors for standards promulgated under § 112(d) must reflect the average emission level that the existing population of best performing sources has achieved. 42 U.S.C. § 7412(d)(3); *U.S. Sugar*, 830 F.3d at 633; *Sierra Club*, 479 F.3d at 880-881. EPA must demonstrate with substantial evidence that its floors meet this requirement. *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 866 (D.C. Cir. 2001). In the challenged rule, however, EPA "has chosen" to exclude the last decade of emissions information from its floor calculations because it does not want to promulgate the "more stringent" standards that could result if its floors reflect the emission levels actually achieved by the best performing boilers. 87 Fed. Reg. at 60,822/1, JA____. The limited set of post-2013 emissions data EPA placed in the record confirm the effect of this choice. Virtually all of these data, which EPA categorically excluded from its floor calculations, reflect emission levels that are better than EPA's floors. Revised Floor Analysis at 6-7, App. H, at Tab 1, JA____-____, ____. EPA's refusal to set floors reflecting the emission levels actually achieved by the relevant best performing sources contravenes the statute and defies repeated decisions by this Court.

15

Contrary to EPA's claims, *U.S. Sugar* did not authorize EPA to ignore the last decade of Industrial Boilers' actual performance just by remanding the agency's 2013 standards without vacatur in response to the agency's petition for rehearing on remedy. EPA acknowledged that, whether the defective limits were vacated or just remanded, it would have to "promulgate revised standards." EPA Rehearing Petition at 6. The Clean Air Act makes plain that, with the exception of standards promulgated under § 112(d)(4) and (d)(5) which do not apply here, all standards "promulgated under" § 112(d) must comply with § 112(d)(2) and (d)(3). 42 U.S.C. § 7412(d)(2)-(3). For its part, § 112(d)(3) makes plain that floors must reflect the emission levels actually achieved by the best performing sources, those with the lowest emissions for which EPA has or could reasonably obtain emissions information. *Id.* § 7412(d)(3). *See, e.g.*, *U.S. Sugar*, 830 F.3d at 631-632; *Sierra Club*, 479 F.3d at 878-881. *U.S. Sugar* does not hold or even suggest EPA need not comply with § 112(d)(3) in promulgating standards subject to its remand order.

Nor did the *U.S. Sugar* Court give EPA permission to disregard the statute by not telling EPA which data to use when it promulgated standards to replace those the Court had found defective. There was no need for the Court to issue such instruction. As noted above, the Clean Air Act requires all standards promulgated under § 112(d) to comply with the stringency requirements in § 112(d)(3), unless

16

they are promulgated under § 112(d)(4) or (d)(5). 42 U.S.C. § 7412(d)(2)-(3), (d)(4), (d)(5).

Equally unavailing is EPA's argument that § 112(d)(3) does not actually require it to set floors reflecting the average emission level achieved by the best performing twelve percent of boilers for which it has or could reasonably obtain emissions information. The statute expressly directs EPA to do so, and EPA has not shown that Congress did not mean what § 112(d)(3) says.

Further, even if § 112(d)(3) were ambiguous as to the sources and emission levels on which EPA must base its floors, EPA's interpretation of this provision would be unlawful. Nowhere has EPA provided a reasoned explanation for assuming it has some unwritten authority to adjust the stringency of § 112(d) limits on hazardous air pollutants by selectively excluding emissions information from its floor calculations.

Finally, EPA's floors are arbitrary and capricious. This Court has already made plain that, to promulgate non-arbitrary floors, EPA must demonstrate with substantial evidence that they reflect the actual emission levels achieved by the relevant best performing sources. *Cement Kiln Recycling Coalition*, 255 F.3d at 866. Here, far from making this demonstration, EPA admits it chose to exclude emissions information in its possession from its floor calculations to avoid setting "more stringent" floors at the levels actually achieved by the best performing

17

sources. 87 Fed. Reg. at 60,822/1. The record confirms EPA's approach worked; the limited post-2013 data EPA put in the record show its floors are not only worse than the emission levels achieved by the best performing boilers but worse than the emission levels that virtually every boiler has been achieving since the 2013 Rule's compliance date. Revised Floor Analysis at 6-7, JA____-____.

## STANDARD OF REVIEW

"It is well established that 'when the statute's language is plain, the sole function of the courts … is to enforce it according to its terms.'" *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004).

On questions of statutory interpretation, this Court rejects agency interpretations that are either contrary to the "unambiguously expressed intent of Congress" or unreasonable. *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. Agency interpretations are unreasonable under *Chevron* if they go beyond the scope of the statute's ambiguity, *Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 893 (D.C. Cir. 1996), exceed "the bounds of reasonable interpretation," *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 321 (2014)), "frustrate the policy that Congress sought to implement," *Shays v. FEC*, 528 F.3d

18

914, 925 (D.C. Cir. 2008) (internal quotation marks and citation omitted), or if the agency has not "offered a reasoned explanation for why it chose that interpretation," *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011).

The Court reviews agency actions and decisions under the "arbitrary and capricious" standard. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is arbitrary and capricious where the agency has not "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" or has "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Of particular relevance here, EPA's floors for emission standards promulgated under § 112(d) are arbitrary and capricious where EPA has failed to demonstrate with substantial evidence that they reflect the average emission level actually achieved by the relevant best performing sources, those with the lowest emission levels. *Cement Kiln Recycling Coalition*, 255 F.3d at 865-866; *Sierra Club*, 479 F.3d at 880-881.

## STANDING

Environmental Petitioners have standing to bring this suit on behalf of their members. *See Friends of the Earth v. Laidlaw Env't. Servs. (TOC)*, 528 U.S. 167,

19

181 (2000). Environmental Petitioners' members live, work, and recreate near major sources of hazardous air pollution regulated by the Industrial Boilers rule. They are exposed to toxic air emissions from Industrial Boilers, and suffer other harm including additional health risks and a diminished ability to engage in and enjoy recreational and aesthetic interests. *See* Declarations.

Because the Industrial Boilers rule does not reduce these emissions as required by the Clean Air Act, it prolongs and increases this harm. The Court may redress these injuries by ordering EPA to follow the Clean Air Act on remand. *See, e.g.*, *NRDC v. EPA*, 749 F.3d 1055, 1062 (D.C. Cir. 2014); *Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 672-73 (D.C. Cir. 2013); *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012).

## ARGUMENT

## I.  EPA'S NEW EMISSION LIMITS CONTRAVENE § 112(d)(3)'S FLOOR REQUIREMENTS.

Because EPA excluded all the emissions information that it obtained after 2013 from its floor calculations, its floors do not reflect the emission levels achieved by the relevant best performing sources. Accordingly, they contravene § 112(d)(3), which unambiguously provides that EPA's floors must reflect "the emission level actually *achieved* by the best performers (those with the lowest emission levels)…" *Sierra Club*, 479 F.3d at 880. *See Lamie*, 540 U.S. at 534 ("It

20

is well established that 'when the statute's language is plain, the sole function of

the courts … is to enforce it according to its terms.'").

## II. *U.S. SUGAR* DOES NOT EXCUSE EPA FROM COMPLIANCE WITH THE CLEAN AIR ACT.

EPA argues the *U.S. Sugar* Court's decision on rehearing silently gave the

agency permission to exclude the post-2013 emissions data from its floor

calculations. 87 Fed. Reg. at 60,821-60,822, JA____-____. Nothing in either the

Court's short rehearing decision or its merits decision lends any support to that

argument.

In its merits decision, the Court found that many of EPA's emission limits in

the 2013 Rule were unlawful because they did not reflect the emission levels

"actually *achieved* by the best performers (those with the lowest emission levels)."

*U.S. Sugar*, 830 F.3d at 631 (quoting *Sierra Club*, 479 F.3d at 880-881) (citing

*Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 861 (D.C. Cir. 2001))). To

the extent the rehearing decision addresses EPA's obligations on remand at all, it

merely directs EPA to "conduct further proceedings consistent with" the merits

decision. *U.S. Sugar*, 671 Fed. Appx. at 823.

Far from giving EPA permission to exclude from its floor calculations all

emissions information showing Industrial Boilers' performance over the last

decade, as EPA assumes, the merits decision confirms that floors must reflect the

average emission levels that "the *existing* population" of best performers "*has*

21

*achieved*." *U.S. Sugar*, 830 F.3d at 633 (quoting *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1142 (D.C. Cir. 2013). By excluding the post-2013 data, EPA produced floors that do not even purport to reflect the emission levels that the "existing population" of the best performing boiler "has achieved," *id.* Indeed, EPA itself explains that it excluded the post-2013 emissions data precisely to avoid setting the "more stringent" limits that reflect what the existing population of best performers has achieved. 87 Fed. Reg. at 60,822/1, JA____. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to "tailor" legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").

Nor did the *U.S. Sugar* Court give EPA permission to exclude the post-2013 emissions data just by remanding the rule rather than vacating it, as EPA suggests. 87 Fed. Reg. at 60,821/3, JA____. As EPA has acknowledged, the Court's decision required the agency to "promulgate revised standards." EPA Rehearing Petition at 6, JA____. The Clean Air Act provides that, with the exception of standards promulgated under § 112(d)(4) and § 112(d)(5), all standards "promulgated under" § 112(d) must comply with the stringency requirements in § 112(d)(2)-(3). 42 U.S.C. § 7412(d)(2)-(3) (d)(4), (d)(5).

For the same reason, the *U.S. Sugar* Court did not need to tell EPA that the agency had to include the post-2013 emissions data in its floor calculations. 87

22

Fed. Reg. at 60,821/3, JA____. The statute itself unambiguously requires EPA's floors to reflect "the emission level actually *achieved* by the best performers (those with the lowest emission levels)…" *Sierra Club*, 479 F.3d at 880. The post-2013 data identify the best performers and show the emission levels they have achieved. EPA confirms this point by explaining it excluded the post-2013 data from its floor calculations because it did not want to set the "more stringent" standards that could result if it included them. 87 Fed. Reg. at 60,822/1, JA____.

Nor does it matter that *U.S. Sugar* required EPA to revise only some of the limits in the 2013 Rule. 87 Fed. Reg. at 60,821/3, JA____. Leaving aside that EPA had to redo the floors for more than half of all the limits in the rule, EPA's newly promulgated standards for Industrial Boilers are standards "promulgated under" § 112(d). 42 U.S.C. § 7412(d)(2). Accordingly, they must comply with the stringency requirements in § 112(d)(2)-(3). Congress did not carve out an exception for situations where EPA promulgates revised standards in response to a remand and does not want them to be more stringent than the ones they replace. Rather, as shown by the statutory text, Congress chose to create only the specific exceptions enumerated in § 112(d)(4) and (d)(5). "Where Congress explicitly enumerates certain exceptions to a general prohibition "additional exceptions are not to be implied, in the absence of a contrary legislative intent." *Sierra Club v. EPA*, 551 F.3d 1019, 1028 (D.C. Cir. 2008) (quoting *NRDC v. EPA*, 489 F.3d

23

1364, 1374 (D.C. Cir. 2007) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 28

(2001))). The same is true here, where § 112(d)(4) and (d)(5) enumerate specific

and carefully tailored exceptions to § 112(d)(2)'s general mandate that standards

"promulgated under" § 112(d) must comply with the stringency requirements in

§ 112(d)(2)-(3). 42 U.S.C. § 7412(d)(2)-(3), (d)(4), (d)(5).

## III.    EPA'S STATUTORY INTERPRETATION IS UNLAWFUL.

### A. EPA's Statutory Interpretation Is Contrary to Congress's Plainly Expressed Intent.

Perhaps aware that *U.S. Sugar* does not actually excuse it from compliance

with § 112(d), EPA also argues it was free to exclude the post-2013 emissions data

it has because Congress did not intend the phrase "for which the Administrator has

emissions information" in § 112(d)(3)(A) to "compel collection or consideration of

additional data." *Id.*

Whether EPA should collect or consider "additional data" is not the issue.

EPA itself states that its 2013 Boilers Rule "incorporated electronic reporting

requirements" and "[a]s a result" EPA now has post-2013 emissions information

on its Compliance and Emissions Data Reporting Interface (CEDRI) and

WebFIRE databases. *Id.* at 60,820/3 & n.5, JA_____. Indeed, EPA not only has

post-2013 emissions data, but used these data in evaluating beyond-the-floor

limits. 87 Fed. Reg. at 60,822/1, JA_____; Revised Floor Analysis at 6-7, JA_____-

_____. Thus, the question before the Court is not whether EPA should collect

24

"additional" emissions information but whether it is free to exclude from its floor calculations emissions information that it has in its possession.

On this point, EPA argues that Congress intended § 112(d)(3)(A)'s requirement to base floors on the best performing sources "for which the Administrator has emissions information" only to "ensure that the EPA need not obtain emissions data from 100 percent of the source category or subcategory in order to identify the best performing 12 percent" and "prevent delay in regulating emissions of hazardous air pollutants." 87 Fed. Reg. at 60,821/3, JA_____. Thus, EPA takes the position that the statute leaves it free to exclude or ignore the performance of any sources it does not want to consider and that it can use this discretion to manipulate the stringency of the emission standards it promulgates. *Id.* at 60,821-60,822, JA_____-_____.

To the contrary, § 112(d)(3)(A) expressly provides that standards for categories or subcategories with 30 or more sources must not be less stringent than the emission level achieved by the lowest emitting sources "for which the Administrator has emissions information." 42 U.S.C. § 7412(d)(3)(A). Similarly, § 112(d)(3)(B) provides that for categories with fewer than 30 sources, standards must not be less stringent than the emission levels achieved by the lowest emitting boilers "for which the Administrator has or could reasonably obtain emissions information." *Id.* § 7412(d)(3)(B). *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438,

25

461–462 (2002) (We "must presume that a legislature says in a statute what it

means and means in a statute what it says there.") (internal quotation marks

omitted)).

Moreover, § 112(d)(3) expressly "exclude[s]" from EPA's floor calculations

"those sources which have within 18 months before the emission standard is

proposed or within 30 months before such standard is promulgated, whichever is

later, first achieved a level of emission rate or emission reduction which complies,

or would comply if the source is not subject to such standard, with the lowest

achievable emission rate (as defined by section 7501 of this title) applicable to the

source category and prevailing at the time, in the category or subcategory for

categories and subcategories with 30 or more sources…" 42 U.S.C.

§ 7412(d)(3)(A). By expressly excluding those sources from EPA's floor

calculations, Congress made plain it did not intend to exclude other sources. *See*

*NRDC*, 489 F.3d at 1259 (Congress's enactment of specific exclusions in a

statutory provision show Congress did not intend to create others).

It does not help EPA to assert that § 112(d)(3) does not mean what it says.

87 Fed. Reg. at 60,821/3, JA____. "[F]or [ ] EPA to avoid a literal interpretation at

*Chevron* step one, it must show either that, as a matter of historical fact, Congress

did not mean what it appears to have said, or that, as a matter of logic and statutory

structure, it almost surely could not have meant it." *New Jersey*, 517 F.3d at 582

26

(quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C.Cir.1996)).

Although EPA is correct that Congress wanted to put an end to the agency's delay

in regulating air toxics and may be correct that Congress did not want the agency

to have to collect data for 100 percent of sources in a category when it promulgated

§ 112(d) standards, 87 Fed. Reg. at 60,821/3, JA____, these points scarcely show

Congress did not also mean what § 112(d)(3) actually says: that floors must be

based on the best performing sources for which EPA has or could reasonably

obtain emissions information. 42 U.S.C. § 7412(d)(3)(A)-(B). *See Sierra Club v.

EPA*, 21 F.4th 815, 825 (D.C. Cir. 2021) ("EPA may not construe the statute in a

way that completely nullifies textually applicable provisions meant to limit its

discretion.") (quoting *Whitman v. American Trucking Ass'ns.*, 531 U.S. 457, 485

(2001))).

Further, the history of § 112 and the problem Congress was trying to solve

by enacting this provision confirm that Congress did intend what § 112(d)(3) says.

Congress deliberately "eliminat[ed] much of EPA's discretion" over the regulation

of hazardous air pollutants when it rewrote § 112 in the Clean Air Act

Amendments of 1990. *New Jersey*, 517 F.3d at 578. Among the restrictions

Congress imposed are the detailed and mandatory stringency provisions in

§ 112(d)(3). As this Court has already held, Congress intended these provisions to

ensure that floors reflect the emission levels actually achieved by the best

27

performing sources, "those with the lowest emission levels." *Sierra Club*, 479 F.3d
at 880-881; *U.S. Sugar*, 830 F.3d at 631-633. It is entirely consistent with this
purpose for Congress to specify that the best performing sources must be ones for
which EPA has or could reasonably obtain emissions information to ensure that
EPA's floors match the performance these best performing sources have actually
achieved.

EPA argues that considering the post-2013 data could have a "potentially
inequitable" result because the revised limits would be relatively stricter than the
ones *U.S. Sugar* didn't require the agency to revise. 87 Fed. Reg. at 60,822/1,
JA____. That policy argument is irrelevant under the statute, which requires all
standards promulgated under § 112(d)(2) and (d)(3) to satisfy the stringency
requirements in § 112(d)(2)-(3). 42 U.S.C. § 7412(d)(2)-(3). *See Utility Air
Regulatory Group v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to
"tailor" legislation to bureaucratic policy goals by rewriting unambiguous statutory
terms.").

In any event, EPA expresses no concern about the "potential[] inequit[y]"
created by its decision to weaken 6 of the 34 limits it revised. 87 Fed. Reg. at
60,817/1, JA____. More fundamentally, EPA's professed concern about
"potential[] inequit[y]" ignores fairness to the people who are exposed to Industrial
Boilers' toxic emissions. Congress required EPA to have lawful § 112(d) standards

28

in place for Industrial Boilers no later than November 15, 2000. 42

U.S.C.  7412(e)(1); *see New Jersey*, 517 F.3d at 578. EPA has yet to meet this

requirement, and for more than 20 years its delay and evasion of the Act's plain

requirements – *see supra* at 8-10 – has deprived people living near Industrial

Boilers of protection that Congress intended the Act to guarantee. During this same

time period, companies operating Industrial Boilers have enjoyed the economic

benefit of having standards that were weaker than the Clean Air Act required or no

standards at all. Contrary to EPA's belief, equity dictates that EPA finally comply

with the Clean Air Act and set the standards this statute requires, rather than

dodging the law because it does not want to set "more stringent" standards. 87 Fed.

Reg. at 60,822/1, JA____. If EPA wishes to level up the other limits, the agency

acknowledges it can do so. *Id.*

## B. EPA's Statutory Interpretation Is Unlawful under *Chevron* Step Two.

Even if the Clean Air Act § 112(d)(3) were ambiguous regarding the sources

on which EPA must base its floors, EPA's claim that § 112(d)(3) does not require

it to base floors on the best performing sources "for which the Administrator has

emissions information," 42 U.S.C. § 7412(d)(3)(A), "diverges from any realistic

meaning of the statute." *Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 893

(D.C. Cir. 1996). Section 112(d)(3) expressly requires EPA to base floors on the

performance of these sources, and even under *Chevron* step two, "agencies must

29

operate within the bounds of reasonable interpretation." *Michigan v. EPA*, 135 S.

Ct. 2699, 2707 (2015) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S.

302, 321 (2014)).

Further, courts cannot defer to an agency interpretation where the agency

has not "offered a reasoned explanation for why it chose that interpretation."

*Village of Barrington,* 636 F.3d at 650. Here, EPA offers only its assertion that

Congress intended the relevant language in § 112(d)(3) "to ensure that the EPA

need not obtain emission data from 100 percent of the source category or

subcategory in order to identify the best performing 12 percent" and "to prevent

delay in regulating emissions of hazardous air pollutants." 87 Fed. Reg. at

60,821/3/JA____. That assertion, even if correct, scarcely explains why Congress

did not also mean what § 112(d)(3) says, that floors must reflect the emission

levels achieved by the best performing sources for which EPA has or could

reasonably obtain emissions information. 42 U.S.C. § 7412(d)(3)(A), (d)(3)(B).

*See Michigan*, 135 S. Ct. at 2706 ("Not only must an agency's decreed result be

within the scope of its lawful authority, but the process by which it reaches that

result must be logical and rational.") (quoting *Allentown Mack Sales & Serv., Inc.

v. NLRB*, 522 U.S. 359, 374 (1998)).

If the statute really granted EPA discretion to selectively exclude valid

emissions data from its floor calculations to avoid setting more stringent standards,

as EPA claims, 87 Fed. Reg. at 60,821-60,822, JA____-____, the agency could easily tailor the stringency of its standards just by choosing the vintage of its data. Indeed, EPA admits it has done that here. 87 Fed. Reg. at 60,822/3, JA____. Because EPA does not and cannot identify any textual constraints on the discretion it asserts to manipulate the stringency of its air toxics standards by selectively excluding data, its interpretation drains meaning from § 112(d)(3)'s floor provisions and frustrates Congress's purpose in enacting them. *See Whitman*, 531 U.S. 485 (rejecting interpretation that would nullify restrictions that Congress placed on EPA discretion); *New Jersey*, 517 F.3d at 578 (Congress intended § 112 to eliminate much of EPA's discretion over the regulation of hazardous air pollutants); *S. Coast Air Quality Mgmt. Dist. v, EPA*, 472 F.3d 882, 894 (D.C. Cir. 2006) ("at no point does EPA explain how its interpretation fits with the 1990 Amendments, which Congress purposefully crafted to limit EPA discretion.").

Excluding data that shows better performing sources and better emission levels than EPA wants its standards to require is just another way to avoid basing floors on the emission levels actually achieved by the relevant best performing sources. This Court has repeatedly held that maneuver to be unlawful. *U.S. Sugar*, 830 F.3d at 631-632; *Sierra Club*, 479 F.3d at 880-881; *Cement Kiln Recycling Coalition*, 255 F.3d at 866.

31

## IV.    EPA'S FLOOR APPROACH IS ARBITRARY AND CAPRICIOUS.

When EPA promulgates emission standards under § 112(d), the agency

bears the burden of demonstrating "with substantial evidence – not mere

assertions" that its floor approach produces floors that satisfy the statute. *Cement*

*Kiln Recycling Coalition*, 255 F.3d at 866. Here, because it "has chosen" to

exclude all its post-2013 emissions information from its floor calculations, 87 Fed.

Reg. at 60,822/1, JA____, EPA has not demonstrated and cannot demonstrate that

its floors reflect the actual performance of the best performing boilers. *See* 42

U.S.C. § 7412(d)(3); *Sierra Club*, 479 F.3d at 880-881.

Indeed, far from showing that its floors <u>do</u> reflect the emission levels

achieved by the best performing boilers for which it has or could reasonably obtain

emissions information, *Cement Kiln Recycling Coal.*, 255 F.3d at 866, EPA

effectively admits they <u>do not</u>. EPA states it "has chosen" to exclude post-2013

data precisely because it didn't want to establish the more protective emission

standards that could result if its floors actually reflected the emission levels

achieved by the best performing boilers. 87 Fed. Reg. at 60,822/1, JA____.

Moreover, the record shows that floors reflecting the best sources' actual

emission levels would be more protective than the floors EPA set in the challenged

rule. EPA itself states that, for 22 of the new limits it promulgated, its floor

approach yielded limits that were less protective than the ones it promulgated in

32

2013. 87 Fed. Reg. at 60,826/1, JA___. EPA's 2013 Rule, however, has required

every boiler in every subcategory to comply with its 2013 limits since January 31,

2016 compliance date. 78 Fed. Reg. 7138, 7138/3 (January 31, 2013), JA____.

EPA's 2013 limits are, literally, the worst emission level that any boiler has been

allowed to achieve since that date. That 22 out of the 34 new limits EPA

promulgated are worse than this worst-permissible level confirms EPA's floors do

not reflect the emission levels the best performing 12 percent of boilers in the

existing boiler population (or the best performing 5 boilers in subcategories with

fewer than 30 sources) have actually achieved. *See* 42 U.S.C. § 7412(d)(3); *U.S.

Sugar*, 830 F.3d at 833; *Sierra Club*, 479 F.3d at 880-881; *Cement Kiln Recycling

Coalition*, 255 F.3d at 866.

The post-2013 emissions information EPA put in the record but excluded

from its floor calculations further confirm this point. They show that virtually all

boilers for which EPA has post-2013 data are achieving levels "below the 2013

limit." Revised Floor Analysis at 6-7, JA____.

Although EPA mitigated the impact of its floor approach by setting beyond-

the-floor limits equal to the 2013 limits in 16 of the 22 instances where its floor

approach yielded floors that were worse than the 2013 limits, 87 Fed. Reg. at

60,826/1, JA____, that does not show that the final limits EPA set reflect the

relevant best performing boilers' actual emission levels. *See Cement Kiln*

*Recycling Coalition*, 255 F.3d at 866. To the contrary, EPA's selective use of the post-2013 compliance data solely for the purpose of evaluating beyond-the-floor limits confirms the arbitrariness of the agency's floor approach. If these data are appropriate to use in setting beyond-the-floor limits, why are they not appropriate to use in setting floors? *See Transactive Corp. v. U.S.*, 91 F.3d 232,237 (1996) ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently."); *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) ("In sum, the Secretary has inadequately explained why the 1984 data were suitable for one significant calculation but unreliable for another.").

Finally, EPA acted irrationally by assuming that *U.S. Sugar* silently gave it permission to set floors that do not reflect the emission levels actually achieved by the best performing sources. The statute is clear on this point, and this Court's decisions – including *U.S. Sugar* – have repeatedly reminded EPA that its floors must reflect the average emission levels that "the *existing* population" of best performers "*has achieved*." *U.S. Sugar*, 830 F.3d at 633 (quoting *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1142 (D.C. Cir. 2013). *See also Sierra Club* 479 F.3d at 880-881; *Cement Kiln Recycling Coalition*, 255 F.3d at 861. Accordingly, the Court had no reason to tell EPA it could not simply choose to ignore these sources and their actual emission levels in calculating floors.

Nowhere in the record does EPA explain its *non sequitur* assumption that the Court's understandable silence on this point constituted judicial permission to violate the plain meaning of the statute.

## CONCLUSION

Environmental Petitioners respectfully request that the challenged rules be remanded with instruction that EPA issue revised rules free of the defects identified above.

DATED:    June 26, 2023                     Respectfully submitted,

*/s/ James S. Pew*
James S. Pew
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for California Communities Against Toxics, Coalition For A Safe Environment, Sierra Club, and Utah Physicians for a Healthy Environment*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Counsel hereby certifies, in accordance with Federal Rules of Appellate Procedure 32(a)(7)(B) that the foregoing **Proof Opening Brief of California Communities Against Toxics**, **Coalitions For A Safe Environment, Sierra Club, and Utah Physicians for a Healthy Environment** contains 7,905 words, as counted by counsel's word processing system, and thus complies with the 13,000 word limit.

Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) & (a)(6) because this document has been prepared in a proportionally spaced typeface using **Microsoft Word 2016** using **size 14 Times New Roman** font.

DATED: June 26, 2023

*/s/ James S. Pew*
James S. Pew

36

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of June, 2023, I have served the foregoing **Proof Opening Brief of California Communities Against Toxics**, **Coalitions For A Safe Environment, Sierra Club, and Utah Physicians for a Healthy Environment**, including the Addendum thereto, on all registered counsel through the court's electronic filing system (ECF).

*/s/ James S. Pew*
James S. Pew